## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA
**Civil Division**

**PAUL GAYTER**
1253 Center Harbor Place
Reston, Virginia 20194

    **Plaintiff,**

      **v.**

**AMERICAN INTERNATIONAL
GROUP, INC.**
70 Pine Street
New York, New York 10270

Serve:  Prentice-Hall Corporation System, Inc.
       1090 Vermont Avenue, N.W.
       Washington, D.C. 20005

    **- and -**

**WIND INTERNATIONAL, INC. f/k/a
WYNDHAM INTERNATIONAL, INC.**
501 East Camino Real
Boca Raton, Florida 33432

Serve:  Corporation Service Company
       1090 Vermont Avenue, N.W.
       Washington, D.C. 20005

    **- and -**

**DUDLEY CLARK & CHAN, L.L.P.**
9720 Estate Thomas, Havensight
St. Thomas, U.S. Virgin Islands 00802

Serve:  Adriane J. Dudley, Registered Agent
       9720 Estate Thomas, Havensight
       St. Thomas, U.S. Virgin Islands 00802

    **- and -**

Case No. _____

**DOUGLAS C. BEACH**                      )
9720 Estate Thomas, Havensight           )
St. Thomas, U.S. Virgin Islands 00802    )
                                         )
        - and -                          )
                                         )
**BILL E. SCHROEDER**                    )
200 Muirfield Road                       )
Los Angeles, California 90004            )
                                         )
        **Defendants.**                  )
_____  )

## COMPLAINT AND JURY DEMAND

COMES NOW PLAINTIFF Paul Gayter, by counsel, and states as follows for his

Complaint against Defendants American International Group, Inc.; Wind International, Inc.

(f/k/a Wyndham International, Inc.); Dudley Clark & Chan, L.L.P., Douglas C. Beach, and Bill

E. Schroeder. This is an action for damages arising out of Defendants' intentional, malicious,

and abusive instigation of criminal and immigration proceedings against Plaintiff.

### THE PARTIES

1.      Plaintiff Paul Gayter is an adult resident of the Commonwealth of Virginia

who lives at 1253 Center Harbor Place, Reston, Virginia 20194. Mr. Gayter is the husband of

Flora Nicholas. Mr. Gayter and Ms. Nicholas are the parents of S.G., who is their minor

daughter, and A.G., who is their minor son. (Mr. Gayter, Ms. Nicholas, S.G., and A.G. are

referred to collectively herein as "the Gayters" or "the Gayter family.") The Gayters are British

citizens who live, and at all relevant times lived, in the United States legally pursuant to valid

immigration documentation.

2.      Defendant American International Group, Inc. ("AIG") is a corporation

organized under the laws of the State of Delaware. AIG is a holding company that, through its

- 2 -

subsidiaries, is engaged in a broad range of insurance and insurance-related activities in the United States and abroad. AIG maintains its principal place of business at 70 Pine Street, New York, New York 10270.

3.     Defendant Wind International, Inc. (f/k/a Wyndham International, Inc.) ("Wyndham") is a corporation organized under the laws of the State of Delaware. On June 27, 2006, Wyndham amended its articles of incorporation and changed its legal name from Wyndham International, Inc. to Wind International, Inc. Wyndham is and was, at all relevant times, the parent corporation of Wyndham Management Corporation ("Wyndham Management"). Wyndham maintains its principal place of business at 501 East Camino Real, Boca Raton, Florida 33432.

4.     Defendant Dudley Clark & Chan, L.L.P. ("Dudley Clark & Chan") is a law firm with offices in St. Thomas, United States Virgin Islands, and New York, New York. Dudley Clark & Chan represents, and at all relevant times represented, Defendant Wyndham in the civil action *Nicholas, et al. v. Wyndham International, et al.*, 3:01-cv-147-CVG-GWC (D.V.I.). Upon information and belief, no members of Dudley Clark & Chan are residents of the Commonwealth of Virginia. Defendant Dudley Clark & Chan is and was, at all relevant times, an agent of Defendants AIG and Wyndham, and was, at all relevant times, acting within the scope of its agency, and with actual and/or apparent authority. Defendants AIG and Wyndham approved and/or ratified all of Defendant Dudley Clark & Chan's acts and omissions as set forth herein.

5.     Defendant Douglas C. Beach is and was, at all relevant times, an attorney with the firm Dudley Clark & Chan. Defendant Beach is and was, at all relevant times, counsel of record for Defendant Wyndham in the civil action *Nicholas, et al. v. Wyndham International,*

*et al.*, 3:01-cv-147-CVG-GWC (D.V.I.). Upon information and belief, Defendant Beach is a resident of the United States Virgin Islands. Defendant Beach is and was, at all relevant times, an employee and/or agent of Defendants Dudley Clark & Chan, AIG, and Wyndham, and was, at all relevant times, acting within the scope of his employment and/or agency, and with actual and/or apparent authority. Defendants Dudley Clark & Chan, AIG, and Wyndham approved and/or ratified all of Defendant Beach's acts and omissions as set forth herein.

6.    Defendant Bill E. Schroeder is the sole proprietor of the Law Offices of Bill E. Schroeder, a law firm located in Los Angeles, California. Defendant Schroeder is and was, beginning in February 2002, counsel of record for Defendant Wyndham in the civil action *Nicholas, et al. v. Wyndham International, et al.*, 3:01-cv-147-CVG-GWXC (D.V.I.). Upon information and belief, Defendant Schroeder is a resident of the State of California. Defendant Schroeder is and was, at all relevant times, an agent of Defendants AIG and Wyndham, and was, at all relevant times, acting within the scope of his agency, and with actual and/or apparent authority. Defendants AIG and Wyndham approved and/or ratified all of Defendant Schroeder's acts and omissions as set forth herein.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332, insofar as Plaintiff is a citizen of a different State than each Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.    This Court further has personal jurisdiction over all Defendants pursuant to D.C. Code § 13-423(a)(1), insofar as Plaintiff's claims for relief arise from Defendants, either directly or by their agents, transacting business in the District of Columbia. Specifically, Defendants Dudley Clark & Chan, Douglas C. Beach, and Bill E. Schroeder, as agents of, and in

course of providing legal services to, Defendants AIG and Wyndham, personally appeared for and conducted numerous depositions of Plaintiff and Ms. Nicholas in the District of Columbia during the litigation of the lawsuit *Nicholas, et al. v. Wyndham International, et al.*, 3:01-cv-147-CVG-GWXC (D.V.I.). Defendants conducted these depositions in furtherance of their premeditated plan to intimidate, coerce, and harass Plaintiff by abusing the civil discovery process and maliciously instigating criminal and immigration proceedings against him. Defendants further transacted business in the District of Columbia when they, directly or by their agents, personally liaised with representatives of the United States Department of Labor in the District of Columbia, and made knowingly false and unsubstantiated allegations against Plaintiff for the express purpose of wrongfully instigating criminal and immigration proceedings against him. As set forth herein, Plaintiff's claims for relief arise directly from these business transactions.

9.     This Court further has personal jurisdiction over all Defendants pursuant to D.C. Code § 13-423(a)(3), insofar as Defendants, acting directly or by their agents, caused tortious injury to Plaintiff in the District of Columbia by acts or omissions committed in the District of Columbia. Specifically, Defendants, acting directly or by their agents, subjected Plaintiff to repeated abusive and harassing depositions in the District of Columbia. Defendants conducted these depositions in furtherance of their premeditated plan to intimidate, coerce, and harass Plaintiff by abusing the civil discovery process and maliciously instigating criminal and immigration proceedings against him. Defendants ultimately used the transcripts of these depositions to maliciously instigate criminal and immigration proceedings against Plaintiff. Defendants committed tortious acts in the District of Columbia when they, directly or by their agents, personally liaised with representatives of the United States Department of Labor in the

District of Columbia, and made knowingly false and unsubstantiated allegations against Plaintiff

for the express purpose of wrongfully instigating criminal and immigration proceedings against

him. As a direct and proximate result of Defendants' acts in the District of Columbia, Plaintiff

incurred damages in the District of Columbia, including attorneys' fees.

      10.     Venue in this action properly lies in this Court pursuant to 28 U.S.C.

§ 1391(a), insofar as a substantial part of the events giving rise to Plaintiff's claims occurred in

the District of Columbia.

### THE FACTS

***The Sexual Molestation of S.G.***

      11.     On April 9, 2000, the Gayters checked into the Wyndham Sugar Bay

Beach Club & Resort ("Wyndham Sugar Bay"), located in St. Thomas, United States Virgin

Islands, for a vacation.

      12.     The Gayters were paying guests of the Wyndham Sugar Bay from April 9,

2000, to April 15, 2000.

      13.     Shortly after their arrival at the resort, the Gayter family was greeted by

resort employee Bryan Hornby.

      14.     Hornby was the lead coordinator of the "Kids' Klub" program at the

Wyndham Sugar Bay.

      15.     The Kids' Klub was a day-care program in which the minor guests of the

Wyndham Sugar Bay participated in recreational activities, such as swimming, water sports, and

evening movies, under the supervision of resort staff members.

      16.     Hornby described the Kids' Klub program and activities to the Gayters,

and encouraged Mr. Gayter and Ms. Nicholas to place S.G. and A.G. in the Kids' Klub.

17.    Mr. Gayter and Ms. Nicholas were persuaded by Hornby, and placed S.G. (who was then nine years old) and A.G. (who was then seven years old) in the Kids' Klub program on multiple occasions during their stay at the Wyndham Sugar Bay.

18.    On April 30, 2000, shortly after the Gayter family returned to their home in Virginia, S.G. revealed to her parents that Hornby had sexually molested her while they were at the resort.

19.    S.G. struggled with whether to tell anyone about what Hornby had done, but decided to tell her parents after she read a passage in the book *Chicken Soup for the Kid's Soul* advising:

> No matter if you're a boy or girl, if someone touches you and it makes you feel uncomfortable, it's wrong. It's a sin. *Please listen to me.* Tell an adult—a parent, a friend's parent, a teacher, a pastor or the police. Keep telling, until someone will help you. But get help *now!*

20.    The Gayters immediately informed the police about Hornby's criminal acts, and Hornby was arrested in the United States Virgin Islands on May 2, 2000.

21.    The subsequent criminal investigation revealed that, during the week of April 9, 2000, Hornby had repeatedly abused S.G. during Kids' Klub activities in an escalating series of sexual molestations.

22.    Hornby most frequently molested S.G. during Kids' Klub movie nights, an activity held during the evenings in a dark amphitheater in the resort's main building.

23.    During these movie nights, Hornby forced S.G. to sit on his lap in the back of the amphitheater and sexually molested her.

24.    Hornby also molested S.G. during Kids' Klub swimming events that were held in one of the resort's hot tubs. While in the hot tub, Hornby sexually molested S.G.

25.    In March 2001, Hornby was tried and convicted by a jury of sexually

molesting S.G. Specifically, Hornby was found guilty of engaging in sexual contact with a person not his spouse, to wit, S.G., who is under thirteen years of age by intentionally touching her vagina with his fingers in violation of 14 V.I.C. § 1708(2).

26.     Hornby was sentenced to five (5) years in prison, and was required to register as a sex offender upon his release.

### The Civil Action Against Hornby and Wyndham

27.     On or about December 5, 2000, Mr. Gayter and Ms. Nicholas filed a civil suit in the United States District Court of the Virgin Islands, both in their individual capacities and as the next friends of S.G., based on Hornby's sexual assaults (the "Civil Action").

28.     The complaint in the Civil Action was ultimately amended to name Bryan Hornby, Rik Blyth, Sugar Bay Club & Resort Corporation ("Sugar Bay Corp."), Wyndham Management, and Wyndham as defendants. The complaint asserted claims of assault and battery, failure to protect the safety of guests, negligent hiring and/or retention, negligent supervision, misrepresentation, constructive fraud, deceptive trade practices, infliction of emotional distress, and *respondeat superior*.

29.     Rik Blyth was named as a defendant because he was the general manager of the Wyndham Sugar Bay when the molestations occurred.

30.     Sugar Bay Corp. was the fee simple title owner of the Wyndham Sugar Bay property.

31.     Wyndham Management was responsible for managing and operating the Wyndham Sugar Bay pursuant to a management agreement with the Sugar Bay Corp. (the "Management Agreement").

32.     Under the Management Agreement, Wyndham Management was responsible for running the Kids' Klub program.

33.     Wyndham Management was also responsible for selecting, hiring, and employing the staff who worked at the Wyndham Sugar Bay, including Bryan Hornby.

34.     Wyndham Management is and was, at all relevant times, a wholly owned subsidiary of Wyndham.

35.     At the time of Hornby's sexual assaults on S.G., Wyndham was insured by two commercial general liability policies it had purchased from AIG.

36.     The first policy, numbered 80-0264559, was issued by The Insurance Company of the State of Pennsylvania—a wholly owned subsidiary of AIG—and insured Wyndham for up to $1,000,000 per occurrence, and $2,000,000 in the aggregate (the "Wyndham Primary Policy").

37.     The second policy, numbered RMGL 612-17-24, was issued by National Union Fire Insurance Company of Pittsburgh, PA (d/b/a AIG Executive Liability)—also a wholly owned subsidiary of AIG—and insured Wyndham for up to $1,000,000 per occurrence in excess of the Wyndham Primary Policy, and $3,000,000 in the aggregate (the "Wyndham Excess Policy").

38.     In total, AIG was obligated to indemnify Wyndham for potentially millions of dollars in the Civil Action.

39.     Although the Wyndham Primary Policy and Wyndham Excess Policy were issued by AIG's wholly owned subsidiaries, AIG retained direct responsibility for supervising the litigation of the Civil Action through its AIG WorldSource division.

40.    AIG WorldSource is a division within AIG that is responsible for managing policies issued by AIG's subsidiary insurance companies, and handling claims arising under those policies.

### *AIG, Wyndham, and Their Attorneys Pursue a Scorched Earth Litigation Strategy Against the Gayters*

41.    AIG and Wyndham viciously defended the Civil Action, despite the fact that Hornby had already been convicted by a jury of sexually molesting S.G.

42.    AIG and Wyndham retained no fewer than nine (9) law firms to represent Wyndham's interests in various aspects of the Civil Action.

43.    The law firm of Dudley Clark & Chan was retained as lead defense counsel for Wyndham, Wyndham Management, Sugar Bay Corp., and Rik Blyth (the "Wyndham Defendants") in the Civil Action.

44.    Douglas C. Beach, Esquire, an attorney at Dudley Clark & Chan, was co-lead counsel of record for the Wyndham Defendants in the Civil Action.

45.    Bill E. Schroeder, Esquire, the sole proprietor of the Law Offices of Bill E. Schroeder, was also retained as co-lead counsel of record for the Wyndham Defendants in the Civil Action.

46.    AIG also retained the law firm Hymes & Zebedee, P.C. ("Hymes & Zebedee") to represent Hornby in the Civil Action.

47.    After Hornby was convicted in March 2001, AIG determined that it was no longer obligated, under the terms of the Wyndham Primary Policy, to provide a defense for Hornby's criminal acts.

48.    However, AIG continued to provide a defense for Hornby at Wyndham's express request.

49.    In a letter dated December 12, 2001, Howard EnDean, Regional Vice President of AIG WorldSource, informed Hornby: "Counsel for Wyndham . . . has requested that under the Wyndham policy, for its benefit, that counsel be retained to assist you in the events of the pending lawsuit."

50.    Mr. EnDean also stated in his letter to Hornby: "We [AIG] have agreed on behalf of Wyndham to continue to provide you with a defense of the civil action based on Wyndham's coverage."

51.    Although Hymes & Zebedee was officially counsel of record for Hornby, their fees were paid by AIG, at Wyndham's request, and they defended Hornby solely and expressly for Wyndham's own benefit.

52.    In addition to Dudley Clark & Chan, Bill E. Schroeder, and Hymes & Zebedee, AIG and Wyndham retained the law firms Reed Smith LLP; Baker Hostetler LLP ("Baker Hostetler"); Moore, Dodson & Russell, P.C.; Wilson, Elser, Moskowitz, Edelman & Dicker LLP; Grant & Lebowitz, LLC; and Gaebe, Mullen, Antonelli, Esco & DiMatteo to represent Wyndham's interests in various aspects of the Civil Action.

53.    By and through this army of defense counsel, Wyndham and AIG pursued an aggressive, scorched earth litigation strategy against Mr. Gayter and Ms. Nicholas, including numerous acts of harassment and vexatious litigation.

54.    AIG's and Wyndham's aggressive tactics included hiring a private investigator who harassed the Gayters' friends and business associates and falsely claimed to be working *for* the Gayters, stealing the Gayters' garbage to search for potentially incriminating information, and compelling repeated psychological examinations of the Gayter family.

55.    AIG's and Wyndham's aggressive defense of the clear liability case was

- 11 -

the subject of several media articles, including a June 2005 BusinessWeek article entitled "Tough Tactics—Against a Victim: Why are Wyndham and AIG taking a hard line in a child molestation case?"

56.    An AIG spokesman quoted in the "Tough Tactics" article defended AIG's conduct, saying, "[w]e have an obligation under the terms of the policy to defend Wyndham, and this is part of the defense."

57.    As part of their concerted effort to harass and attack Mr. Gayter and Ms. Nicholas, AIG and Wyndham used their cadre of lawyers to gain access to the Gayters' immigration records, which were utterly irrelevant to the Civil Action.

58.    In December 2001 and February 2002, Wyndham, acting through its legal counsel, demanded that Mr. Gayter and Ms. Nicholas execute releases authorizing any United States federal agency or department to give Wyndham access to "any and all information and records" pertaining to Mr. Gayter, Ms. Nicholas, and S.G. (the "Releases").

59.    Wyndham, through its legal counsel, also propounded numerous discovery requests to the Gayters demanding documents and responses to interrogatories regarding the Gayters' immigration records and status.

60.    Although Mr. Gayter and Ms. Nicholas responded to the discovery requests, they refused to sign the Releases, as any records that could be obtained by the Releases could not possibly have any relevance to the Civil Action, which was based on the repeated sexual molestation of their daughter by Wyndham's criminally convicted employee.

61.    Wyndham, however, continued to demand access to the Gayters' governmental records. On or about May 1, 2002, Beach signed and filed a motion in the Civil Action requesting, on Wyndham's behalf, that the court issue an order compelling Mr. Gayter

- 12 -

and Ms. Nicholas to sign the Releases.

62.    In a May 28, 2002 memorandum in further support of the motion to compel, which was also signed and filed by Beach, Wyndham claimed that its request for access to the Gayters' immigration records was "all part of the discovery process of seeking 'information with which to impeach' Plaintiffs." In reality, however, AIG and Wyndham were searching for some way of turning the Civil Action into a case about the Gayters, not Wyndham's employee, convicted child molester Bryan Hornby.

63.    Unfortunately for the Gayters, Magistrate Judge Jeffery L. Resnick of the United States District Court of the Virgin Islands believed Wyndham's pre-textual arguments and granted the motion to compel.

64.    On or about July 22, 2002, counsel for Mr. Gayter and Ms. Nicholas forwarded executed copies of the Releases to Beach.

65.    On or about August 12, 2002, Beach issued a subpoena *duces tecum* to the United States Immigration and Naturalization Service ("INS") demanding "any and all documents" relating to Mr. Gayter, Ms. Nicholas, and S.G.

66.    On or about August 22, 2002, the INS provided Beach with the Gayters' immigration records pursuant to the subpoena.

67.    With these immigration records in hand, Wyndham deposed Mr. Gayter on October 1, 2002. The deposition was held in Washington, D.C. at the offices of Baker Hostetler, one of the many law firms retained by Wyndham in the Civil Action. The examination was conducted by Bill E. Schroeder, counsel for the Wyndham Defendants. Beach was also present at, and participated in, the deposition.

68.    At the deposition, Schroeder questioned Mr. Gayter extensively about Mr. Gayter's and Ms. Nicholas' immigration status, their INS filings, and the details of their employment histories.

69.    As the Gayters would later learn, Schroeder was preparing the groundwork for a vicious smear campaign against them.  AIG and Wyndham, in cooperation with their attorneys, Dudley Clark & Chan, Beach, and Schroeder, concocted a plan to create a distracting and harassing "trial within a trial" by falsely accusing Mr. Gayter and Ms. Nicholas of committing immigration fraud and money laundering.

70.    Mr. Gayter's deposition continued on November 8, 2002.  The deposition was again held in Washington, D.C. at the offices of Baker Hostetler.  Mr. Gayter was examined by John Zebedee, an attorney at Hymes & Zebedee, counsel for Hornby.  Beach and Schroeder were also present at, and participated in, the deposition.

71.    Although Mr. Zebedee was officially counsel of record for Hornby, his services were paid for by AIG—at Wyndham's request—and he was defending Hornby solely and expressly for Wyndham's own benefit.

72.    Mr. Zebedee also questioned Mr. Gayter extensively about his and Ms. Nicholas' immigration status, their INS filings, and their employment histories.  This questioning was in furtherance of Defendants' calculated and premeditated plan of harassment.

73.    The crux of Defendants' accusations was that Mr. Gayter committed immigration fraud by living in the United States under an H1-B work Visa sponsored by Kim McDonald International Management, Ltd. ("KIM"), while at the same time working for the marketing company Brainwave, Inc. ("Brainwave").

74.    In 1999, Kim McDonald, KIM's president and owner, hired Mr. Gayter to work for KIM in the United States.

75.    In June 1999, KIM filed an H1-B Visa petition on behalf of Mr. Gayter.

76.    In September 1999, Brainwave was incorporated as a closely held company owned entirely by Mr. Gayter.

77.    Mr. Gayter remained an employee of KIM, and performed work for Brainwave pursuant to a subcontractual agreement between Brainwave and KIM.

78.    Mr. Gayter's salary was paid by KIM from funds KIM received from Brainwave under the subcontract.

79.    The corporate arrangements between Mr. Gayter, Brainwave, and KIM, as well as Mr. Gayter's immigration filings were wholly consistent with, and permissible under, United States labor and immigration laws.

80.    Further, Mr. Gayter entered into his employment relationships, incorporated Brainwave, worked for Brainwave under the subcontractual relationship with KIM, and filed his immigration documents pursuant to the advice of competent legal counsel.

81.    In furtherance of Defendants' efforts to perpetrate their distracting and harassing sideshow, Wyndham deposed numerous individuals regarding the Gayters' employment and immigration status during 2002 and 2003. These included Ms. Nicholas, who was repeatedly deposed by Beach and Schroeder in Washington, D.C.; Thomas Ratcliffe, vice president of KIM; Carol Hemingway, the former chief financial officer of Brainwave; Robert Len, a certified public accountant who prepared tax returns for both Brainwave and the Gayters; and Dean Richardson, a certified public accountant who performed tax services for KIM.

82.     In total, Defendants deposed Mr. Gayter and Ms. Nicholas on seven (7) different occasions, each time in the District of Columbia.

83.     Despite the extensive discovery that Wyndham had already taken regarding the Gayters' immigration status, Wyndham attempted to subpoena Brainwave and conduct a corporate deposition under Federal Rule of Civil Procedure 30(b)(6).

84.     By this point, Mr. Gayter and Ms. Nicholas had had more than enough of Wyndham's harassment, and justifiably refused to provide a corporate designee to testify on behalf of Brainwave.

85.     On May 14, 2003, Wyndham filed a motion to compel Brainwave's compliance with the subpoena in the United States District Court for the Eastern District of Virginia (the "Eastern District of Virginia").

86.     On June 13, 2003, a hearing on the motion was held before Magistrate Judge Barry Poretz of the Eastern District of Virginia. At the hearing, Magistrate Judge Poretz informed Beach, who appeared on behalf of Wyndham, that he had spoken on the telephone with Magistrate Judge Resnick regarding the subpoena and the relevancy of Wyndham's request for further immigration discovery on the Gayter family. Magistrate Judge Poretz informed Beach that it was Magistrate Judge Resnick's opinion that "the discovery sought [wa]s far afield, [and] that it had very, very little probative value."

87.     Beach, however, continued to claim at the hearing that "Paul Gayter ha[d] committed a fraud upon the INS" and that Mr. Gayter "lied to stay in this country."

88.     Magistrate Judge Poretz denied Wyndham's motion to compel, and admonished Beach, stating:

- 16 -

My own individual assessment, as I look at the discovery and the
nature of the case, is that the sought discovery is not relevant to a
claim or defense and the probative value is far outweighed by any
prejudice, . . . by it being onerous, by being cumulative, and also it
being possibly embarrassing. It's just not going to be had, at least
not in this district.

89.    AIG, Wyndham, and their attorneys continued to pursue their campaign of

harassment, and sought reconsideration of Magistrate Judge Poretz' ruling.

90.    At a reconsideration hearing held before Judge T.S. Ellis, III of Eastern

District of Virginia on July 18, 2003, Beach again claimed that "the plaintiffs [Mr. Gayter and

Ms. Nicholas] have concocted a scheme with [sic] the INS to stay in this country and they have

filled out forms with regard to the INS that would subject them to perjury or fraud under 18

U.S.C. 1456."

91.    Judge Ellis affirmed Judge Poretz' decision, and similarly admonished

Beach, stating:

[T]here's much in this subpoena that clearly goes to an attempt to
find out that these people may have violated the criminal law by
conspiring to lie to the INS or the BICE or whatever the name is
now. . . . I will tell you by way of obiter that you wouldn't have
that admitted into evidence in a trial in this courthouse . . . .

92.    AIG, Wyndham, and their attorneys were relentless, and appealed Judge

Ellis' decision to the United States Court of Appeals for the Fourth Circuit (the "Fourth

Circuit").

93.    In a brief filed in the Fourth Circuit on October 20, 2003, Wyndham

summarized its allegations against Mr. Gayter and Ms. Nicholas, stating:

[Mr. Gayter's and Ms. Nicholas' immigration] records suggest that
the adult Plaintiffs have repeatedly, continuously and intentionally
lied under penalty of perjury to the INS, and that they concocted an
elaborate fraud involving Brainwave and a business entity known
as Kim McDonald International Mgt. Ltd. ("KIM") owned by
Plaintiffs' personal friend, to create the false appearance that Paul

Gayter was employed by KIM.

94.     Wyndham then detailed, in its Fourth Circuit brief, the extensive discovery that it had conducted to uncover evidence of Mr. Gayter's purported fraud, which included "interrogat[ing] the adult Plaintiffs [Mr. Gayter and Ms. Nicholas] during their individual depositions to determine the scope of the scheme," and "serving deposition and document subpoenas upon: (1) Brainwave's accountant, (2) KIM; and (3) Plaintiffs' original employer."

95.     Wyndham went on to state in its brief that, despite this extensive discovery, it had been unable to uncover any evidence "sufficient to complete the puzzle of Plaintiffs' scheme."

96.     In other words, Wyndham admitted in a public court filing that it did not have sufficient proof that Mr. Gayter or Ms. Nicholas had in fact committed any illegal or fraudulent acts.

97.     On July 2, 2004, the Fourth Circuit affirmed the previous rulings that the immigration-related discovery that Wyndham sought was "unduly burdensome" and "harassing." The Fourth Circuit also told Wyndham that it was "seeking information with the most tenuous connection to the underlying lawsuit," information that was at "the outer limits of conceivable relevance."

98.     Despite this campaign of harassment, Mr. Gayter and Ms. Nicholas persevered, and on November 10, 2004, after nearly four (4) years of protracted litigation, Magistrate Judge George W. Cannon, Jr. of the United States District Court of the Virgin Islands issued an order setting the trial in the Civil Action for March 2005.

*AIG, Wyndham, and Their Attorneys Instigate a Criminal and Immigration*
*Investigation and Deportation Proceedings Against Mr. Gayter and Ms. Nicholas*

99.    With a trial date looming, AIG and Wyndham desperately escalated their aggressive tactics against Mr. Gayter and Nicholas, and instigated a criminal investigation and immigration deportation proceedings against them.

100.    Upon information and belief, in November or December of 2004, and with full knowledge and consent of Defendants, agents of AIG, Wyndham, and their attorneys personally liaised with representatives of the Office of the Inspector General of the United States Department of Labor ("DOL") in Washington, D.C.

101.    Defendants' agents falsely alleged to the DOL that Mr. Gayter and Ms. Nicholas were guilty of immigration fraud and money laundering. AIG and Wyndham also submitted to the DOL selected documents from the Gayters' immigration records that Beach had subpoenaed from INS, as well as transcripts of depositions taken of Mr. Gayter by Schroeder and Mr. Zebedee in the Civil Action.

102.    Defendants made these false allegations even though, in October 2003, over one year earlier, Wyndham stated in the Fourth Circuit that it was unable to uncover sufficient proof that Mr. Gayter or Ms. Nicholas had in fact committed any illegal or fraudulent acts.

103.    In December 2004, Mr. Gayter and Ms. Nicholas learned that they were the subjects of a criminal and immigration investigation that was being conducted by Gordon D. Kromberg, an Assistant United States Attorney for the Eastern District of Virginia, along with investigators Michael E. Gray, a special agent with the Office of Labor Racketeering and Fraud Investigations division of the DOL, and Joe Mizell, a special agent with the Bureau of Immigration and Customs Enforcement.

104.    The Civil Action continued, and, as Defendants had planned, Mr. Gayter and Ms. Nicholas were forced to litigate their daughter's claims against Wyndham, while at the same time defending against the concurrent criminal and immigration investigation that Defendants had maliciously instigated.

105.    The trial in the Civil Action was postponed after Hornby, who at that time was serving his five (5) year sentence for molesting S.G., was purportedly attacked by another prison inmate. The trial in the Civil Action was ultimately rescheduled for August 2005.

106.    On July 6, 2005, in a final effort to resolve the Civil Action short of trial, Magistrate Judge Cannon of the United States District Court for the Virgin Islands scheduled a settlement conference for mid-July 2005.

107.    At the settlement conference, Wyndham agreed to settle the claims that had been raised against it in the Civil Action on terms that Defendants insisted be maintained as confidential.

108.    Even though a settlement agreement was reached in the Civil Action, Mr. Gayter and Ms. Nicholas continued to suffer from the heinous tactics of AIG, Wyndham, and their attorneys, because the criminal and immigration investigation that Defendants had instigated continued.

109.    Mr. Gayter retained several attorneys to represent him during the investigation, including Stephen W. Grafman, who at the time was a partner in the Washington, D.C. office of Kirkpatrick & Lockhart Preston Gates Ellis LLP.

110.    On January 19, 2006, Special Agent Gray and Special Agent Mizell interviewed David K. Sutelan, who was the Gayters' immigration attorney in 1999. Mr. Grafman was also present at this meeting.

111.    During the meeting, Special Agent Gray informed Mr. Grafman that it was representatives from Wyndham who had instigated the investigation, and that the investigation had begun in the November/December 2004 time period.

112.    Special Agent Gray has stated that he will disclose all information and documents relating to Wyndham's instigation of the investigation if he is served with a subpoena.

113.    On June 5, 2006, Mr. Grafman made a submission to Mr. Kromberg laying out the law and facts supporting the legality of the Gayters' actions.

114.    On September 7, 2006, Special Agent Gray informed Mr. Grafman by telephone that the investigation was complete, and that no criminal charges would be pursued against either Mr. Gayter or Ms. Nicholas.

115.    However, during the call Special Agent Gray patched in Special Agent Mizell who advised Mr. Grafman that the United States Department of Homeland Security ("DHS") was instituting a deportation proceeding against Mr. Gayter based on the investigation.

116.    Special Agent Mizell further informed Mr. Grafman that Mr. Gayter would have to report to the United States Citizenship and Immigration office in Fairfax, Virginia, as a Warrant for Arrest of Alien had been issued for Mr. Gayter on August 7, 2006.

117.    On September 14, 2006, Mr. Gayter appeared at the Citizenship and Immigration office where Special Agent Mizell placed him under arrest.

118.    Mr. Gayter's mug shot and fingerprints were taken, and he was required to post a $5,000 bond to secure his release.  Mr. Gayter was also locked in a holding cell and detained while his bond paperwork was processed.

119.    The arrest and detention left Mr. Gayter degraded, humiliated, and disgusted. Immediately after he was released from custody, Mr. Gayter returned home, removed all his clothes, placed them in a trash bag, and threw the bag away.

120.    Deportation proceedings were also begun against Ms. Nicholas as well.

121.    Mr. Gayter retained additional counsel, Tomas Elliot and Fabienne Chatain, attorneys in the Washington, D.C. office of Elliot & Mayock LLP ("Elliot & Mayock"), to handle the immigration proceedings, as Mr. Grafman and the other counsel did not have experience with deportation matters.

122.    DHS soon realized that Mr. Gayter and Ms. Nicholas had not committed fraud or violated any immigration laws, and on April 5, 2007, DHS moved to *voluntarily* terminate the deportation proceedings against them.

123.    On May 9, 2007, United States Immigration Judge John M. Bryant dismissed the case against Mr. Gayter and Ms. Nicholas.

124.    After the dismissal of the immigration case, Special Agent Gray delivered three (3) boxes to the Elliot & Mayock offices that contained investigative materials that had been collected during the preceding investigation.

125.    Although the majority of the materials were submissions that Mr. Gayter's attorneys had made during the investigation, one box contained materials that had been provided to the government by third-parties.

126.    These third-party materials included DVD recordings of Mr. Gayter's October 1, 2002 and November 8, 2002 depositions from the Civil Action. Attached to the DVDs was a sheet from a Reed Smith LLP memo pad with the handwritten note: "Depositions – Gaytor [sic]"

127.    Reed Smith LLP has confirmed that Don A. Innamorato, a partner at that firm who specializes in labor law, represented Wyndham in connection with the Civil Action and the DOL investigation of Mr. Gayter.

128.    The third-party materials also included INS documents that had been provided to Beach in response to his August 2002 subpoena, along with a cover letter from the Office of the Chief Counsel of the DHS that was addressed to Beach.

129.    After the dismissal of the immigration case, Mr. Gayter and Ms. Nicholas submitted Freedom of Information Act ("FOIA") requests to the DHS for copies of their investigative files.

130.    DHS investigation files produced in response to the FOIA requests included a Record of Deportable/Inadmissible Alien for Mr. Gayter, dated August 7, 2006, that set out the purported grounds for his deportation.

131.    The Record of Deportable/Inadmissible Alien states, as a preliminary matter, that "[t]his investigation was predicated by DOL/OIG upon allegations provided to that office. It was alleged that Paul Gayter and his wife, Flora Nicholas Gayter, who currently have permanent residence in the United States, were involved in a conspiracy to commit visa fraud and money laundering."

132.    AIG's and Wyndham's role in instigating the criminal investigation and immigration proceedings is made clear when the allegations set forth in the Record of Deportable/Inadmissible Alien are compared with the allegations set forth in court papers filed by Beach, on Wyndham's behalf, in the Civil Action.

133.    In April 2005, Mr. Gayter and Ms. Nicholas moved *in limine* in the Civil Action to exclude any evidence about their immigration status or alleged immigration fraud or

money laundering at trial.

134.    On April 25, 2005, Beach, on Wyndham's behalf, filed an opposition brief

that set forth Wyndham's allegations against Mr. Gayter and Ms. Nicholas.  Beach wrote in the

opposition brief:

> Gayter and Nicholas had a major immigration visa problem in May
> 1999.  Gayter and Nicholas (husband and wife) had been fired
> from Arnold Communications, an advertising company, while on
> temporary H-1B visas authorizing each of them to work only for
> Arnold.  They left with a valuable client, Cable & Wireless.
> Gayter and Nicholas, in 1999, established their own advertising
> company, called Brainwave, Inc.  However, Gayter needed a new
> H-1B sponsor and Green Card sponsor.

135.    The allegations made by DHS against Mr. Gayter in the Record of

Deportable/Inadmissible Alien, dated August 7, 2006, are identical:

> In May of 1999, they [Mr. Gatyer and Ms. Nicholas] were both
> terminated from AC [Arnold Communications].  The Gayters
> knew they would lose their U.S. work status after their termination.
> Paul Gayter maintained a contract with Cable and Wireless
> (C&W), which had been one of the companies he was working for
> while employed with AC.  His desire was to stay in the U.S., start
> his own business, Brainwave, with the C&W contract he kept from
> AC, and eventually get a green card for himself and his spouse.

136.    Beach also alleged in Wyndham's opposition brief that:

> For four years they [Mr. Gayter and Ms. Nicholas] laundered
> $18,000 a month in bogus payments (totaling over $900,000) from
> their company, Brainwave, Inc. in Virginia, to Kim McDonald
> International Management, Ltd. (KIM) in Boston, and back again
> to Gayter in the form of "sham" salary payments.  Further, they did
> all this to defraud the U.S. Government, specifically, the INS, State
> Department and the Department of Labor . . . so that he and
> Nicholas could stay in the United States and run their own
> business, Brainwave.

137.    Again, the allegations in the Record of Deportable/Inadmissible Alien

mirror Beach's:

> In September 1999, Gayter, with the approval of McDonald,
> started making false salary payments of $18,000 per month to KIM
> US totaling over $800,000 [sic]. These payments funded 100% of
> the phony salary payments paid to Gayter by KIM US. These
> payments enabled Gayter to fraudulently stay in the U.S. and,
> without INS/CIS permission, work for Brainwave as its President
> and Executive Creative Director.

138.    The Record of Deportable/Inadmissible Alien also cites, as evidence of the

alleged fraud, the "sworn civil deposition taken from Paul Gayter on October 1, 2002."

139.    The transcript of that October 1, 2002 deposition could only have been

provided to the government by AIG, Wyndham, and their attorneys.

140.    Indeed, included in the investigation files produced by DHS in response to

the FOIA requests were copies of excerpts from a transcript of Mr. Gayter's deposition in the

Civil Action.

141.    At the top of the first page of Mr. Gayter's deposition transcript are

several, typed internal-Wyndham comments discussing the deposition of Mr. Ratcliffe that

Wyndham took in the Civil Action, including the comment: "You did a great job on ratcliffe

[sic]." Although the author of the comments is not identified, the comments were directed to

either Schroeder or Mr. Zebedee, the two defense counsel who deposed Mr. Ratcliffe in the Civil

Action.

### The Effects of the Heinous Conduct of AIG, Wyndham, and Their Attorneys

142.    Mr. Gayter was forced to retain multiple attorneys to represent him during

the governmental investigation and subsequent immigration deportation proceedings.

143.    To date, Mr. Gayter has incurred over $400,000 in legal expenses as a

result of the investigation and deportation proceedings.

144.    In addition to monetary losses, Mr. Gayter has suffered extreme emotional

and mental distress, and for nearly two and a half (2 ½) years lived in a constant state of fear that

he would be criminally prosecuted and/or deported.

145.    Mr. Gayter has also suffered health problems as the result of the strain of the investigation and deportation proceedings, including insomnia and heart irregularities.

146.    Mr. Gayter suffered these losses solely because AIG and Wyndham wanted to derail the Civil Action and avoid compensating S.G. after she was repeatedly sexually molested by Wyndham's employee, now convicted child molester, Bryan Hornby.

### COUNT I
### Malicious Prosecution
### (All Defendants)

147.    Paragraphs 1-146 are incorporated by reference as though fully set forth herein.

148.    Defendants jointly conspired, planned, and agreed to the unlawful strategy of maliciously instigating immigration proceedings against Mr. Gayter in an effort to defeat the Civil Action.

149.    Pursuant to, and in furtherance of, this unlawful strategy, Defendants, either directly or by their agents and co-conspirators, including Reed Smith LLP and Don A. Innamorato, liaised with representatives of the DOL in Washington, D.C. for the purpose of instigating immigration proceedings against Mr. Gayter.

150.    As a direct and proximate result of Defendants' contacting representatives of the DOL, an investigation was conducted of Mr. Gayter by the Bureau of Immigration and Customs Enforcement, and immigration deportation proceedings were initiated against Mr. Gayter.

151.    Defendants caused the investigation and immigration proceedings to be initiated solely for the unlawful and malicious purpose of harassing Mr. Gayter and to derail the

Civil Action that had been brought against Wyndham as a result of Hornby's molestation of S.G.

152.    Defendants caused the investigation and immigration deportation proceedings to be instituted with willful, wanton, and reckless disregard for Mr. Gayter's rights.

153.    Defendants caused the investigation and immigration deportation proceedings to be instituted without probable cause, and with full knowledge that their accusations were false and unfounded.

154.    Mr. Gayter was arrested and detained as the direct and proximate result of Defendants instigating immigration proceedings against him.

155.    The immigration deportation proceedings ended favorably to Mr. Gayter, and were dismissed on May 9, 2007.

156.    As a direct and proximate result of Defendants' malicious institution of immigration proceedings against Mr. Gayter, Mr. Gayter incurred expenses, including attorneys' fees and costs of not less than $400,000.00, and has suffered, and will in the future suffer, extreme psychological and emotional anguish, humiliation, shame, degradation, fear, and embarrassment, and has suffered, and will in the future suffer, physical health problems, including insomnia and heart irregularities, and is entitled to compensation from Defendants in the amount of not less than $5,000,000.00, which shall be proven at trial.

157.    Because Defendants' conduct was intentional and malicious, Defendants are liable to Mr. Gayter for punitive damages in the amount of $10,000,000.00, which shall be proven at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

(1)    For compensatory damages in the amount of not less than $5,000,000.00, which amount shall be proven at trial;

(2)    For punitive damages in the amount of not less than $10,000,000.00;

(3)    For costs and expenses associated with this suit; and

(4)    For such other and further relief as this Court deems appropriate.

## COUNT II
### Abuse of Process
### (All Defendants)

158.    Paragraphs 1-157 are incorporated by reference as though fully set forth herein.

159.    Defendants jointly conspired, planned, and agreed to the unlawful strategy of abusing and perverting the civil discovery process for the improper and malicious purposes of harassing Mr. Gayter and preventing Mr. Gayter from being able to attend the March 2005 trial that had been set in the Civil Action.

160.    Pursuant to, and in furtherance of, this unlawful strategy, Defendants Douglas C. Beach and Dudley Clark & Chan, as agents of the other Defendants, used the civil discovery process to compel Mr. Gayter to execute governmental records releases and obtain access to Mr. Gayter's immigration records, to which Defendants would not otherwise have had access.

161.    Pursuant to and in furtherance of this unlawful strategy, Defendant Bill E. Schroeder, acting as an agent of the other Defendants, used the civil discovery process to obtain sworn deposition testimony from Mr. Gayter, and others, to which Defendants would not otherwise have had access.

162.    Defendants, either directly or by and through their agents and co-conspirators, used the immigration records obtained through civil subpoena and the depositions taken during the Civil Action, to instigate criminal and immigration proceedings against Mr. Gayter.

163.    Defendants perverted the judicial process by using the immigration records and depositions obtained during civil discovery and for the reckless, improper, and malicious purpose of harassing Mr. Gayter and attempting to prevent Mr. Gayter from being able to attend the trial in the Civil Action.

164.    As a direct and proximate result of Defendants' abuse of process, Mr. Gayter incurred expenses, including attorneys' fees and costs of not less than $400,000.00, and has suffered, and will in the future suffer, extreme psychological and emotional anguish, humiliation, shame, degradation, fear, and embarrassment, and has suffered, and will in the future suffer, physical health problems, including insomnia and heart irregularities, and is entitled to compensation from Defendants in the amount of not less than $5,000,000.00, which shall be proven at trial.

165.    Because Defendants' conduct was reckless, intentional, and malicious, Defendants are liable to Mr. Gayter for punitive damages in the amount of $10,000,000.00, which shall be proven at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

(1)    For compensatory damages in the amount of not less than $5,000,000.00, which amount shall be proven at trial;

(2)    For punitive damages in the amount of not less than $10,000,000.00;

(3)    For costs and expenses associated with this suit; and

(4)    For such other and further relief as this Court deems appropriate.

## COUNT III
### Intentional Infliction of Emotional Distress
### (All Defendants)

166.    Paragraphs 1-165 are incorporated by reference as though fully set forth

herein.

167.    Defendants jointly conspired, planned, and agreed to the unlawful strategy

of intentionally inflicting emotion distress on Mr. Gayter in an effort to defeat the Civil Action.

168.    Pursuant to, and in furtherance of, this unlawful strategy, Defendants,

either directly or by their agents and co-conspirators, including Reed Smith LLP and Don A.

Innamorato, met with representatives of the DOL in Washington, D.C. for the purpose of

instigating criminal and immigration proceedings against Mr. Gayter.

169.    Defendants were fully aware that Mr. Gayter had not violated any criminal

or immigration laws.

170.    Defendants acted recklessly and intentionally and for the express purpose

of intimidating and harassing Mr. Gayter and to break his will to continue litigating the Civil

Action.

171.    Defendants' attempt to wrongfully cause Mr. Gayter to be criminally

charged and deported solely so that Defendants could prevail in the Civil Action is so

outrageous, and so extreme in degree, as to go beyond all possible bounds of decency, and is to

be regarded as atrocious, and utterly intolerable in a civilized community.

172.    As a direct and proximate result of Defendants' actions, Mr. Gayter

suffered severe and extreme emotional distress and—for nearly two and a half (2 ½) years—

lived in a state of constant fear that he would be criminally prosecuted and/or deported.

173.    As a further direct and proximate result of Defendants' actions, Mr. Gayter suffered the degradation and humiliation of being arrested and detained.

174.    As a direct and proximate result of Defendants' intentional infliction of emotional distress, Mr. Gayter has suffered, and will in the future suffer, extreme psychological and emotional anguish, humiliation, shame, degradation, fear, and embarrassment, and has suffered, and will in the future suffer, physical health problems, including insomnia and heart irregularities, and is entitled to compensation from Defendants in the amount of not less than $5,000,000.00, which shall be proven at trial.

175.    Because Defendants' conduct was reckless, intentional, and malicious, Defendants are liable to Mr. Gayter for punitive damages in the amount of not less than $10,000,000.00, which shall be proven at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

(1)    For compensatory damages in the amount of not less than $5,000,000.00, which amount shall be proven at trial;

(2)    For punitive damages in the amount of not less than $10,000,000.00;

(3)    For costs and expenses associated with this suit; and

(4)    For such other and further relief as this Court deems appropriate.

## COUNT IV
## False Light
## (All Defendants)

176.    Paragraphs 1-175 are incorporated by reference as though fully set forth herein.

- 31 -

177.    Defendants jointly conspired, planned, and agreed to the unlawful strategy of maliciously instigating criminal and immigration proceedings against Mr. Gayter in an effort to defeat the Civil Action.

178.    Pursuant to, and in furtherance of, this unlawful strategy, Defendants, either directly or by their agents and co-conspirators, including Reed Smith LLP and Don A. Innamorato, liaised with representatives of the DOL in Washington, D.C. for the purpose of instigating criminal and immigration proceedings against Mr. Gayter.

179.    Defendants, either directly or by their agents and co-conspirators, including Reed Smith LLP and Don A. Innamorato, provided portions of Mr. Gayter's immigration records to representatives of the DOL.

180.    The contents of Mr. Gayter's immigrations records were private and confidential information.

181.    Defendants were only able to obtain that private information after compelling Mr. Gayter to sign a Release authorizing Defendants to have access to his immigration records.

182.    Defendants falsely alleged to the DOL that Mr. Gayter had committed money laundering, immigration fraud, and was living in the United States illegally.

183.    Being accused of committing money laundering, immigration fraud, and being an illegal alien would be offensive to the ordinary person.

184.    Defendants' publication of Mr. Gayter's private information has caused him severe and extreme mental suffering, insofar as the publication caused him to live in a state of constant fear of criminal prosecution and/or deportation for nearly two and a half (2 ½) years.

185.    Defendants' publication of Mr. Gayter's private information also caused him to suffer the degradation and humiliation of being arrested and detained.

186.    As a direct and proximate result of Defendants' placing Mr. Gayter in a false light, Mr. Gayter has suffered, and will in the future suffer, extreme psychological and emotional anguish, humiliation, shame, degradation, fear, and embarrassment, and has suffered, and will in the future suffer, physical health problems, including insomnia and heart irregularities, and is entitled to compensation from Defendants in the amount of not less than $5,000,000.00, which shall be proven at trial.

187.    Because Defendants' conduct was intentional and malicious, Defendants are liable to Mr. Gayter for punitive damages in the amount of not less than $10,000,000.00, which shall be proven at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

(1)    For compensatory damages in the amount of not less than $5,000,000.00, which amount shall be proven at trial;

(2)    For punitive damages in the amount of not less than $10,000,000.00;

(3)    For costs and expenses associated with this suit; and

(4)    For such other and further relief as this Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury with respect to each of the claims alleged herein.

Respectfully submitted,

BODE & GRENIER, LLP

_____
Peter C. Grenier (D.C. Bar No. 418570)
1150 Connecticut Avenue, N.W.
Ninth Floor
Washington, D.C.
Tel:  (202) 828-4100
Fax: (202) 862-4130

*Counsel for Plaintiff*

Dated: May 2, 2008

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

Paul Gayter

**DEFENDANTS**

American International Group, Inc.; Wind International, Inc. (f/k/a Wyndham International, Inc.); Dudley Clark & Chan, L.L.P.; Douglas C. Beach; and Bill E. Schroeder

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____88888_____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Peter C. Grenier, Esquire
Bode & Grenier, LLP
1150 Connecticut Avenue, N.W.
Ninth Floor
Washington, D.C. 20036

ATTORNEYS (IF KNOWN)

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
◉ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A. Antitrust**

☐ 410 Antitrust

◉ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☒ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**     **OR**     ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Malicious prosecution based on Defendants' instigation of immigration deportation proceedings against Plaintiff.

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** 15,000,000.00    Check YES only if demanded in complain

**JURY DEMAND:** YES ☒  NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  May 2, 2008    SIGNATURE OF ATTORNEY OF RECORD  *Peter C. Grenier*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.** RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.